Reversed and Remanded and Opinion filed July 17, 2008








Reversed and
Remanded and Opinion filed
July 17, 2008.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00970-CV

____________

 

WELLINGTON UNDERWRITING AGENCIES
LIMITED; SYNDICATE 2020; ANTON PRIVATE CAPITAL LIMITED; CBS PRIVATE CAPITAL
LIMITED; ARGENTA PRIVATE CAPITAL LIMITED; SYNDICATE 3030; AMLIN UNDERWRITING
LTD.; SYNDICATE 2001; NAVIGATORS UNDERWRITING AGENCY LTD.; SYNDICATE 1221;
MARLBOROUGH UNDERWRITING AGENCY LTD.; SYNDICATE 1861; MANAGING AGENCY PARTNERS
LTD.; SYNDICATE 2791; HARDY (UNDERWRITING AGENCIES) LTD.; SYNDICATE 382;
BEAZLEY FURLONGE LTD.; SYNDICATE 623; HOUSTON CASUALTY COMPANY; NAVIGATORS
INSURANCE COMPANY; AXA CORPORATE SOLUTIONS REASSURANCE-PARIS; AXA CORPORATE
SOLUTIONS IUA;
AXA CORPORATE SOLUTIONS INSURANCE COMPANY; AXA CORPORATE SOLUTIONS REINSURANCE;
AXA CORPORATE SOLUTIONS LLOYD=S INSURANCE COMPANY OF TEXAS; COMMONWEALTH INSURANCE
COMPANY; INTERNATIONAL INSURANCE COMPANY OF HANNOVER LIMITED; and AMERICAN
OFFSHORE INTERNATIONAL SYNDICATE, Appellants

 

V.

 

THE HOUSTON EXPLORATION COMPANY and
OFFSHORE SPECIALTY FABRICATORS, INC., Appellees

 



On Appeal from the 234th
District Court

Harris County, Texas

Trial Court Cause No. 2004-61582










O P I N I O N

Appellants, a group of insurance underwriters lead by
Wellington Underwriting Agencies Limited (collectively AUnderwriters@), bring this
interlocutory appeal from a partial summary judgment order favoring appellees,
The Houston Exploration Company (AHouston
Exploration@) and Offshore Specialty Fabricators, Inc. (AOSFI@).[1] 
Underwriters issued an insurance policy covering an offshore platform project
undertaken by appellees.  Appellees sued Underwriters for Underwriters= failure to pay weather
stand-by charges in connection with covered repairs on the offshore platform
which were delayed by tropical storms.  Underwriters counterclaimed, alleging
that appellees committed fraud, breach of contract, and violations of the Texas
Insurance Code in submitting their insurance claims.  In two issues,
Underwriters contend that the trial court erred in granting summary judgment
favoring appellees on (1) the issue of whether the policy covered weather
stand-by charges, and (2) Underwriters= fraud and breach
of contract counterclaims.  We reverse the trial court=s summary judgment
order and remand for further proceedings in accordance with this opinion.

I.  Background

In 2002, Houston Exploration hired OSFI to build an
offshore production platform in the Gulf of Mexico.  In August of that year,
construction hit unstable ground on the seabed, damaging one of the legs and
leaving the jacketCthe steel legs of the platform anchored
directly to the seabed and supporting the deckCat an unuseable
angle.  As repair efforts progressed, several named tropical storms passed
through the Gulf delaying work.  Rather than release the repair vessels, OSFI
placed them on Astand by@ so that they
would be available as soon as the storms passed.  It is these weather stand-by
charges that are primarily at issue in this case.








Under the contract between Houston Exploration and OSFI,
OSFI was required to purchase builder=s risk insurance
for the platform project.  Through a series of brokers in Houston and London,
OSFI purchased an All Risk Installation Floater policy from Underwriters.  The
policy was based on a Wellington Underwriting Agencies form called the WELCAR
2001.  The policy=s preamble states as follows:

Subject to the terms, conditions
and exclusions herein, this Policy provides coverage for certain physical
damage and liabilities incurred by the Assureds.  Section ICPhysical Damage
and Section IICLiability are distinct sections, with the exception
that the Scope of Insurance and General Terms and Conditions below shall apply
to Section I and Section II.

In
entering the contract, the parties lined through the entirety of Section II,
leaving only coverage for APhysical Damage@ under Section I. 
As will be described below, the parties also lined through certain paragraphs
of Section I.

Under the AScope of Insurance@ section of the
policy (which precedes Section I and  expressly applies to it), the policy provides
that the covered activities include construction and installation, among
numerous other activities.  Paragraph 1 of the Scope of Insurance section
identifies OSFI as the Principal Assured.  Other Assureds are defined as A[a]ny other
company, firm, person or party . . . with whom the Assured(s) . . . have
entered into written contract(s) directly in connection with the Project.@

Paragraph 1 of ASection ICPhysical Damage@ states under the
heading ACovered Perils@ that A[s]ubject to the
terms, conditions and exclusions herein, Section I insures against all risks of
physical loss of and/or physical damage to the property covered hereunder,
provided such loss or damage arises from an Occurrence within the Policy Period
. . . .@  Under the ATerms and
Conditions@ portion of Section I, the first paragraph states as
follows:

1.  BASIS OF RECOVERY

In the event of an Occurrence covered under Section I of the Policy,
Underwriters agree to indemnify the Assured on the following basis:

 








a.       items repaired or replaced - >New for Old= plus towage, installation and all
other costs necessarily incurred and duly justified in repair or replacement -
as per latest agreed Schedule B.

. . . .

d.       use of
prehired vessels/equipment - It is understood and agreed that if, in the
event of physical loss and/or physical damage to the property insured which is
covered by Section I, repairs and/or reinstatement and/or replacement and/or
salvage are carried out by vessels and/or craft and/or equipment and/or labour
which the Assured have on charter, hire or contracted to them, the cost or the
proportion thereof shall be based on the pre-agreed hire or contract rates for
such employment when used in or about the repair, reinstatement, replacement,
or salvage of losses covered by Section I and shall be so recoverable as a
claim hereon.  In the event that the Assured utilises [sic] its own vessels,
craft, equipment, material or labour for any repair, reinstatement, replacement
or other work in respect of physical loss and/or physical damage covered by
Section I, then, subject otherwise to the terms and conditions of the Policy, a
reasonable charge in respect of such work shall be recoverable as a claim
hereon.  Provided always that the recoverable costs referred to in this
paragraph shall not exceed the costs of employing approved vessels and/or craft
and/or equipment and/or materials and/or labour from other available sources.

Paragraph
2 incorporates the following clause from the AInstitute Clauses
for Builders Risks@:

5.       PERILS

5.1     SUBJECT
ALWAYS TO ITS TERMS, CONDITIONS AND EXCLUSIONS this insurance covers all risks
of physical loss of or physical damage to the subject matter insured caused and
discovered during the period of the insurance.

Among the provisions lined-through or stricken-out in
Section I is Paragraph 13, which reads as follows:

13.     STAND-BY CHARGES








Subject to a sub limit of US$
(AMOUNT) and one Occurrence aggregated at US$ (AMOUNT) over the Policy Period,
Underwriters shall indemnify the Assureds for the cost of stand by time on
vessels and/or craft and/or equipment actively engaged in the course of repair
following an Occurrence covered under Section I, where the Assureds are
prevented from working in, around or about the damaged property by bad weather,
including named hurricanes.

Lastly,
among the deductibles listed in the policy declarations is the following
applicable to stand-by charges:  Avi.  48 hours each
and every Occurrence in respect of stand-by charges.@

The parties do not dispute that the damage to the platform
jacket occurring in August 2002 was a covered occurrence under the policy. 
Appellees filed a claim with Underwriters; Underwriters paid the majority of
the claim ($2,034,961.12) but refused to pay the weather stand-by charges
allegedly incurred when repair vessels were unable to work due to tropical
storms in the Gulf.  As mentioned above, appellees sued Underwriters for
failure to reimburse the weather stand-by charges.  Underwriters
counterclaimed, alleging fraud, breach of contract, and violations of the Texas
Insurance Code in the submission of the claims.  The trial court granted
partial summary judgment, holding Underwriters responsible for the stand-by
charges under the policy and consequently granting judgment against
Underwriters= fraud and breach of contract counterclaims.  In its
order, the trial court explained its ruling thus:

Plaintiffs [appellees] sought
judgment on their claim for coverage under the All Risk Installation Floater
policy of insurance (the APolicy@) and on the issue
of whether the Proof of Loss executed by OSFI barred Houston Exploration=s claim under the
Policy.  Underwriters sought judgment on their defenses that coverage did not
exist and/or that any liability had been released.  The Court, having
disregarded the stricken policy language as parol evidence, found the Policy to
be unambiguous in favor of coverage.  The Policy is only ambiguous if the
stricken language is read into the Policy, and then treated as an exclusion. 
The stricken language is parol evidence that creates an ambiguity,
necessitating further parole evidence.  Whereas parol evidence may be used to
interpret an ambiguous contract, it cannot be used to create an ambiguity.  By
ignoring the stricken language and treating it as never having been in the
policy (as is the case when only looking at the four corners of the Policy),
the contract is unambiguous.  (Emphasis in original).








It is
from this order that the present interlocutory appeal is brought.  We begin by
addressing the coverage issue and then will briefly address the counterclaims.

II.  Coverage

A.  Standards of Review

In their first issue, Underwriters contend that the trial
court erred in granting summary judgment favoring appellees on the coverage
question and in refusing to grant summary judgment favoring Underwriters.  More
specifically, Underwriters contend that the trial court incorrectly interpreted
the insurance policy as covering weather stand-by charges.  We analyze the
grant of a traditional motion for summary judgment under well‑established
standards of review.  See generally Tex. R. Civ. P. 166a; Nixon v.
Mr. Prop.  Mgmt. Co., Inc., 690 S.W.2d 546, 548‑49 (Tex. 1985).  The
movant bears the burden to show that there is no genuine issue of material fact
and that it is entitled to judgment as a matter of law.  Tex. R. Civ. P.
166a(c).  We review the motion and the evidence de novo, taking as true all
evidence favorable to the nonmovant, and indulging every reasonable inference
and resolving any doubts in the nonmovant=s favor.  Valence
Operating Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005).  Where, as here,
both sides filed motions seeking summary judgment on the same issue, and the
trial court granted one while denying the other, we review both sides= summary judgment
evidence, determine all questions presented, and, if the trial court erred, 
render the judgment the trial court should have rendered.  Id.








The sole question before us in Underwriters= first issue
concerns the correct interpretation of the insurance policy.   In Texas,
insurance policies are construed according to the ordinary rules of contract
construction.  Am. Mfrs. Mut. Ins. Co. v. Schaefer, 124 S.W.3d 154, 157
(Tex. 2003).  In applying these rules, our primary concern is to ascertain the
parties= intent as
expressed in the language of the policy.  Kelley‑Coppedge, Inc. v.
Highlands Ins. Co., 980 S.W.2d 462, 464 (Tex. 1998).  To determine that intention,
we generally limit our inquiry to the Afour corners@ of the policy.  See
Esquivel v. Murray Guard, Inc., 992 S.W.2d 536, 544 (Tex. App.CHouston [14th
Dist.] 1999, pet. denied).  When possible, we must harmonize all of the
provisions with reference to the entire agreement; no single provision should
be read as controlling.  Coker v. Coker, 650 S.W.2d 391, 393 (Tex.
1983).  If a written policy is worded so that it can be given a definite or
certain legal meaning, then it is unambiguous, and we may not accept parol or
extrinsic evidence as to the parties= intent.  Kelley‑Coppedge,
980 S.W.2d at 464.  Whether policy language is ambiguous is a question of
law.  Schaefer, 124 S.W.3d at 157.  Ambiguity does not arise simply
because the parties offer conflicting interpretations; rather, ambiguity exists
only when the contract is susceptible of two or more reasonable
interpretations.  Id.  Moreover, ambiguity must be evident from the
policy itself; it cannot be created by introducing parol evidence of intent.  Fiess
v. State Farm Lloyds, 202 S.W.3d 744, 747 (Tex. 2006).  Usually, if
language in an insurance policy is deemed susceptible to more than one
reasonable interpretation, the reasonable construction most favorable to the
insured is imposed.  See Nat=l Union Fire Ins.
Co. of Pittsburgh, Pa. v. Hudson Energy Co., 811 S.W.2d 552, 555 (Tex. 1991). 
We thus construe an ambiguous insurance policy strictly against the insurer and
liberally in favor of the insured.  Barnett v. Aetna Life Ins. Co., 723
S.W.2d 663, 666 (Tex. 1987).

B.  Appellees= Contentions








In their motion for summary judgment and on appeal,
appellees point to four portions of the policy as demonstrating that weather
stand-by charges were covered:  (1) Covered Perils paragraph 1, wherein it
states that the policy Ainsures against all risks@; (2) Terms and
Conditions subparagraph 1a, stating that the basis of recovery includes all
costs Anecessarily
incurred and duly justified in repair or replacement@; (3) subparagraph
1d of the same section, wherein it provides for payment for vessels and
equipment Awhen used in or about the repair@; and (4) the list
of deductibles, which lists a deductible of A48 hours each and
every Occurrence in respect of stand-by charges.@[2]  We will consider
each of these sections in turn and then will examine stricken paragraph 13,
which expressly discusses weather stand-by charges.

1.  Aall risks@

Appellees first argue that the fact that the policy
expressly Ainsures against all risks of physical loss of
and/or physical damage to the property@ means that
weather stand-by charges are covered.  In support of their argument, appellees
rely primarily on the United States Supreme Court=s opinion in Lanasa
Fruit Steamship & Importing Co. v. Universal Insurance Co., 302 U.S.
556 (1938), and our opinion in de Laurentis v. United Services Automobile
Association, 162 S.W.3d 714 (Tex. App.CHouston [14th
Dist.] 2005, pet. denied).  According to appellees, these cases stand for the proposition
that the stand-by charges are covered under this all risk policy because they Anaturally flowed@ from the damage
to the platform jacket.  We disagree.








In Lanasa, the Supreme Court stated that A[a]ll the
consequences naturally flowing from the peril insured against, or incident
thereto, are properly attributable to the peril itself.@ 302 U.S. at 565
(quoting Magoun v. New England Marine Ins. Co., 1 Story 157 (C.C.D.
Mass. 1840)).  However, the court was speaking of physical losses as
consequences of an occurrence; it was not defining which costs associated with
repairs would be recoverable.  Indeed, the Aconsequences@ at issue in Lanasa,
and in all the examples from other cases cited therein, were physical damage,
physical loss, physical consequences, not costs associated with repairs.  The
claim in Lanasa itself involved a stranded steamship and a cargo of
bananas that rotted before the vessel could be freed.  Id. at 557. 
While the insurance policy at issue covered Aperils of the sea,@ the insurer
argued that the bananas were ruined by Ainherent vice,@ i.e.,
natural processes of decay, and not directly by a peril of the sea, i.e.,
the stranding.  Id. at 560-61.  The Court rejected this argument,
holding that the stranding was the Areal efficient
cause@ of the loss of
the fruit.  Because the stranding was a covered occurrence, the physical loss
of the fruit that naturally flowed from the occurrence was covered under the
policy.[3]

In de Laurentis, we considered whether mold damage
to a house was covered under a homeowner=s policy.  162
S.W.3d at 721.  The insurance company argued that mold was not a covered peril
under the Anamed-perils policy.@  We agreed with
the homeowner that the mold damage was caused by a water leak, which was a
covered peril under the policy.  Id. at 724-25.  We explained that Aa physical loss
includes the natural consequences of the named peril@ and consequently
the mold Adamage could be a physical loss covered under
the . . . policy.@  Id. at 723, 725 (emphasis added).[4]

In sum, all of the cases cited by appellees in their
all-risk argument involved questions of coverage of physical loss or physical
damage, not whether certain costs of repair should be paid by the insurer.  The
weather stand-by charges themselves did not constitute Aphysical loss@ of or Aphysical damage@ to covered
property; rather, as a cost associated with repairing the original damage, they
are a cost caused only by a delay in the repairs.








Instead of looking to case law to determine what costs an
insurance policy covers, we should look first to the policy itself.  The policy
in the present case expressly subjects coverage of all risks to Athe terms,
conditions and exclusions@ contained within the policy.  The policy
also contains a ABasis of Recovery@ section, which
explains what costs of repair will generally be paid (subject to other
provisions offering additional coverage and various exclusions).  If the Aall risk@ language in the
Covered Perils section meant that Underwriters would pay all costs associated
with repairs, then the policy=s Basis of Recovery section would be
rendered surplusage.  See Seagull Energy E & P, Inc. v. Eland Energy,
Inc., 207 S.W.3d 342, 345 (Tex. 2006) (stating that a contract should be
read so that no provision is rendered meaningless).  Accordingly, we find
appellees= argument that the fact that the policy uses Aall risks@ language means it
necessarily covers weather stand-by charges to be without merit.

2.  Anecessarily incurred and duly
justified@

Appellees next point to subparagraph 1a and the statement
contained therein that the Basis of Recovery under the policy includes all
costs Anecessarily
incurred and duly justified in repair or replacement.@  In its brief,
Houston Exploration wholly fails to make an argument as to why the weather
stand-by charges would have been covered as included within the Anecessarily
incurred@ language. 
Houston Exploration instead cites to a report wherein the Underwriters= adjuster stated
that the stand-by charges were Acommensurate with normal vessel day rates
being charged in the Gulf of Mexico at the time of loss, and approved this
amount as directly claim related.@  While the report
supports the conclusion that the charges may have been Aduly justified,@ it says nothing
about their necessity.








In its brief, OSFI states that weather stand-by charges are
routine and necessary in the Gulf during hurricane season and that payment of
the charges Awas critical to ensure that vessels were available@ to effect repairs
after the storms passed.  In support of these claims, OSFI cites to affidavits
from an expert retained by Houston Exploration and from an employee of Houston
Exploration=s project manager for the platform installation project. 
Both men averred that had the repair vessels been released instead of being
paid for stand-by time, and had OSFI and Houston Exploration attempted to Aimmediately@ seek repair
vessels after the storms passed, the rate for such vessels would have been
substantially higher than the stand-by charges.[5]

It is unclear exactly what this parol evidence proves.  At
best, it appears to establish that if appellees wanted to get repairs underway immediately
after the storms passed, paying stand-by charges would have been a good
idea.  It does not, however, prove as a matter of law that stand-by charges
were Anecessarily
incurred,@ and it certainly does not support the trial court=s holding that the
parties expressed a clear intent within the four corners of the policy to cover
weather stand-by charges.  See, e.g., Esquivel, 992 S.W.2d at 544
(stating that in determining the intention of parties to an insurance policy, a
court should generally limit its inquiry to the four corners of the policy).[6]

3.  Aused in or about the repair@








Appellees next cite subparagraph 1d, which provides a basis
of recovery for the use in repairs of Aprehired@ vessels and equipment. 
As relevant to our purposes here, the provision states that if repairs are
carried out by vessels that the assured already has hired out, the payable cost
for use of the vessels shall be based on the pre-agreed rates for the time that
the vessels are being Aused in or about the repair.@  Appellees argue
that the Awhen used in or about the repair@ language covers
vessels that are on stand by waiting for storms to pass.  They particularly
emphasize the Aor about@ language,
apparently recognizing that vessels on stand by are by definition not being Aused in@ repair efforts. 
Appellees offer no definition of Aabout.@  The American
Heritage Dictionary defines Aabout@ when used as a
preposition as meaning:  A1. On all sides of; surrounding.  2. In
the vicinity of; around. . . .  6.  Ready or prepared to do something. . . . 
7. Involved with or engaged in.@  Am. Heritage Dictionary (2d College Ed.
1991).  Webster=s defines it as A1 : in a circle
around . . . 2 a : in the immediate neighborhood of : NEAR, fish are abundant ~
the reefs) . . . e : at the command of : in readiness for the use of . . .  3 a
: in the act or process of doing : engaged in . . . b : on the point or verge
of . . . .@  Webster=s Third New
International Dictionary (1993).  The gist of these definitions suggests that a
vessel that is being Aused . . . about [a] repair@ is going to be in
close proximity and either engaged in or immediately ready and available to
work.  Thus, a vessel that has left the area or is unable to work due to
tropical storms in the Gulf is not then being  Aused . . . about
[a] repair.@  Consequently, appellees= reliance on
section 1d as covering weather stand-by charges is without merit.

4.  A48 hours each and every Occurrence@








Lastly, appellees point to a sentence fragment among a list
of deductibles at the end of the policy.  The item states in full:  A48 hours each and
every Occurrence in respect of stand-by charges.@  Appellees argue
that this stand-by deductible proves as a matter of law that the policy covers
weather stand-by charges.  We again acknowledge that generally, a contract
should be read as a whole and an interpretation giving effect to every part of
the agreement favored so that no provision is rendered meaningless.  See
Seagull Energy, 207 S.W.3d at 345.  However, because here the only
reference to stand-by charges in the agreement other than the deductible was
the stricken paragraph 13 (and as will be discussed below, the striking of
Paragraph 13 indicates the parties did not intend for weather stand-by charges
to be covered), we find the stand-by deductible to be mere surplusage and of no
effect.  See Republic Ins. Co. v. Silverton Elevators, Inc., 493 S.W.2d
748, 753 (Tex. 1973) (finding that inapplicable and meaningless surplusage in
an insurance policy should be disregarded).[7] 
In sum, none of the policy sections cited by appellees unambiguously
demonstrates an intent to cover weather stand-by charges.

C.  Paragraph 13

Having determined that the unstricken portions of the
policy do not unambiguously provide coverage for weather stand-by charges, we
now turn to consideration of Section I, Paragraph 13, entitled AStand-by charges.@  It reads as
follows:

Subject to a sub limit of US$
(AMOUNT) and one Occurrence aggregated at US$ (AMOUNT) over the Policy Period,
Underwriters shall indemnify the Assureds for the cost of stand by time on
vessels and/or craft and/or equipment actively engaged in the course of repair
following an Occurrence covered under Section I, where the Assureds are
prevented from working in, around or about the damaged property by bad weather,
including named hurricanes.

As
discussed above, this portion of the policy form was lined-out but remained in
the instrument that was initialed by the parties.








Appellees first argue that this section should not be
considered in interpreting the policy because it is parol evidence and not part
of the four corners of the agreement.  Underwriters cite several cases, most
notably Gibson v. Turner, 156 Tex. 289, 294 S.W.2d 781 (Tex. 1956), and Westchester
Fire Insurance Co. v. Stewart & Stevenson Services, Inc., 31 S.W.3d 654
(Tex. App.CHouston [1st Dist.] 2000, pet. denied), in which Texas
courts have consideredCto one degree or anotherCstricken language
in interpreting a contract.  In Gibson, the Texas Supreme Court
interpreted an unambiguous oil and gas lease in light of the fact that a
certain clause had been struck.  156 Tex. at 296-97, 294 S.W.2d at 785. 
Appellees attempt to minimize the impact of Gibson by suggesting that
the court=s review of the stricken language in that case was
essentially dicta because other portions of the lease at issue supported the
court=s interpretation. 
But the court itself identified the stricken language as one of four parts of
the lease supporting its holding.  Id.  Furthermore, the court described
the stricken portion as a provision of the lease and indicated that it was
within the four-corners of the instrument.  Id. at 782-83, 785. 
Accordingly, we read Gibson as directly supporting the notion that
stricken language in an agreement can be utilized in interpreting the
agreement.

In Westchester, the First Court of Appeals
interpreted an unambiguous insurance policy in light of the fact that a
particular paragraph, although remaining in the final version of the policy,
was noted as being Adelet[ed] in its entirety.@  31 S.W.3d at
659-60 & n.4.[8] 
The court expressly stated that in considering the fact of the deletion, it was
Alooking solely at
the four corners of the . . . policy.@  Id. at
660 n.4.  We find that both Gibson and Westchester support the
notion that deletions remaining within an insurance policy can be considered in
construing an unambiguous insurance policy.








Appellees next argue that even if Paragraph 13 is
considered, it only served to create a Asub limit@ for weather
stand-by charges and did not create coverage for such charges.[9] 
We disagree.  The
language Appellees rely on in arguing that paragraph 13 imposes only a
sub-limit and does not create coverage reads:  ASubject to a sub limit of US$
(AMOUNT) and one Occurrence aggregated at US$ (AMOUNT) over the Policy Period .
. . .@  Appellees= proposed construction does not make
legal or grammatical sense.  Legally, it does not make sense because it only
takes into account the first one and one-half lines of the paragraph, which
mentions the sub-limit, and ignores as superfluous the remaining four and
one-half lines, which begin by stating that AUnderwriters shall indemnify the
Assureds for the cost of stand by time . . . .@  The law strongly disfavors such a
result.  See Seagull Energy, 207 S.W.3d at 345 (stating that a contract should be
read so that no provision is rendered meaningless).  Grammatically, the appellees= construction does not make sense
because the phrase ASubject to a sub limit of US$ (AMOUNT) and one Occurrence
aggregated at US$ (AMOUNT) over the Policy Period . . .@ is a dependent, adverb clause that
modifies the remainder of the sentence, the independent clause.  Specifically,
as an adverb phrase, its purpose is to modify the verb Ashall indemnify@ by stating to what degree
Underwriters shall indemnify the assureds.  Making a modifying phrase the focal
point of a sentenceCwhile ignoring the verb it modifies and the independent
clause in which the verb residesCturns grammar on its head.

Having determined that the stricken language in paragraph
13 can be considered in construing the policy and that such language would have
served to create weather stand-by coverage had it not been stricken, we must
now examine the impact of the stricken language on our interpretation of the
policy.  Simply put, it is decisive.








To begin with, the creation of weather stand-by coverage in
stricken paragraph 13 strongly suggests that such coverage was not intended to
be included elsewhere in the policy; otherwise, as stated above, paragraph 13
would be mostly redundant, superfluous, and surplusage.  See id. 
Perhaps more importantly, the language of Paragraph 13 appears designed to
complement the language of subparagraph 1d discussed above.  Paragraph 13
states that AUnderwriters shall indemnify . . . for the cost of
stand by time on vessels . . . where the Assureds are prevented from working
in, around or about the damaged property by bad weather.@  It defines Astand by time@ as when vessels Aare prevented from
working in, around or about@ repairs.  Subparagraph 1d provides a
basis of recovery for when vessels are Aused in or about
the repair.@  In other words, subparagraph 1d governs when vessels
are being used in repair efforts, and paragraph 13 governs when vessels are not
being used because of foul weather.  This further establishes that absent
Paragraph 13, the policy was not intended to cover weather stand-by charges.[10] 
Moreover, the fact that the policy contains a separate paragraph providing for
weather stand-by charges also indicates that such charges would not be
considered as Anecessarily incurred@ under
subparagraph 1a.

Based on the foregoing analysis, we find that the policy
unambiguously expresses an intent that weather stand-by charges not be covered.[11] 
The trial court erred in granting summary judgment favoring appellees and in
refusing to grant summary judgment favoring Underwriters on this coverage
question.  Accordingly, we sustain Underwriters= first issue.

III.  Counterclaims

In their second issue, Underwriters contend that the trial
court erred in granting summary judgment favoring appellees on Underwriters= counterclaims for
fraud and breach of contract.  As Houston Exploration=s counsel
acknowledged during oral argument, our holding on Underwriters= first issue is
dispositive of this second issue.  In other words, having sustained
Underwriters= first issue, the basis for the trial court=s grant of summary
judgment against the counterclaims is removed.  The trial court itself
recognized this linkage in its certification of the interlocutory appeal,
wherein it stated the two issues for review were (1) whether the policy
provided coverage for weather stand-by charges, and (2) if such coverage
exists, whether Underwriters= counterclaims are
without merit.  Accordingly, we sustain Underwriters= second issue.








We reverse the trial court=s order and remand
for further proceedings in accordance with this opinion.

 

 

/s/      Adele Hedges

Chief Justice

 

 

Judgment rendered
and Opinion filed July 17, 2008.

Panel consists of
Chief Justice Hedges and Justices Fowler and Boyce.









[1]  The trial court signed an order for interlocutory
appeal pursuant to Texas Civil Practice and Remedies Code section 51.014(d). 
Tex. Civ. Prac. & Rem. Code '
51.014(d).





[2]  In the trial court, Houston Exploration filed a
motion for summary judgment that OSFI joined.  Both of these parties have filed
briefs on appeal.  We will consider all of the arguments of both parties as
relevant to the appeal.





[3]  The Magoun case, heavily relied upon by the Lanasa
court, involved a ship that had been detained by government authorities (a
covered peril) and then had rotted while left exposed in a hot climate (a
noncovered peril).  1 Story 157.  The court concluded that the resulting
physical damage to the vessel was covered because it naturally flowed from the
detention.  Id.  Similarly, in Reischer v. Borwick, 2 Q.B. 548
(1894), an English common law case cited by the Lanasa court, the court
concluded that the physical damage to a vessel from water rushing in through a
temporarily plugged hole naturally flowed from the collision that caused the
hole.





[4]  Appellees also cite Stanley v. Onetta Boat Works,
Inc., 303 F.Supp. 99 (D. Ore. 1969), in which the court considered whether
damages for loss of use of a vessel while being repaired were covered under an
insurance policy.  Again, this case involved a physical loss and not a
calculation of costs associated with repairs.





[5]  The project manager=s employee stated the rate would have been at least twice that of the
vessels placed on stand by.  The expert opined that the rate would have been
25-100% higher.  Neither man cited any evidence as to what repair vessel rates
actually were after the storms passed.





[6]  The cited evidence also does not directly support
OSFI=s contentions that (1) weather stand-by charges are
routine and necessary in the Gulf during hurricane season, and (2) such
payments were  critical to ensure that vessels were available.  In their reply
brief, Underwriters cite to additional evidence as demonstrating that most of
the charges at issue were paid for OSFI=s own
vehicles.  It is left unsaid in the record whether stand-by payments were
necessary to keep these vessels from being hired out to do repairs for another
company after the storm.





[7]  The parties apparently simply failed to strike the
language out.  Obviously, since there is no coverage for weather stand-by
charges, it would not have seemed particularly important to the parties to
eliminate this otherwise meaningless deductible.

We further note that the parties also
failed to strike references to Section II of the policy, which was itself stricken
in its entirety.  The unstricken deductible appears to do no more to resurrect
coverage of weather stand-by charges than the unstricken references to Section
II do to resurrect Section II.





[8]  Specifically, the Adeleted@ section of the policy defined Aloss@ to include
defense costs.  A separate  section also defined Aloss@ but did not mention defense costs.  The paragraph
immediately preceding the latter definition stated that the former definition
was Adelet[ed] in its entirety.@  The court expressly examined the Adeleted@
definition in concluding that the remaining definition did not include defense
costs.  Westchester, 31 S.W.3d at 659-60.





[9]  In other words, appellees contend that the reference
to stand-by charges in Paragraph 13 only recognized the existence of stand-by
coverage elsewhere in the policy.  They argue that Paragraph 13 merely capped
that coverage.





[10]  Appellees additionally urge that in an all-risk
insurance policy, stricken language cannot take the place of a specific
exclusion.  However, we do not read the stricken section as an exclusion but
instead use it in interpreting the contract as a whole.  See Coker, 650
S.W.2d at 393 (advising that courts should try to harmonize all provisions of a
contract with reference to the entire agreement and that no single provision
should be read as controlling).  In other words, the stricken language of
paragraph 13 confirms that without paragraph 13, the policy does not cover
weather stand-by charges.





[11]  Both sides cite to parol evidence as supporting
their preferred interpretation of the policy.  Because we find the policy is
unambiguous, we need not review the parol evidence.  See Kelley‑Coppedge,
980 S.W.2d at 464.