**WESTCHESTER FIRE INSURANCE COMPANY, Appellant,**

v.

**STEWART & STEVENSON SERVICES, INC., Appellee.**

**No. 01–99–00738–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 24, 2000.

Rehearing Overruled Nov. 15, 2000.

Michael Smith Knippen, Chicago, IL, for appellant.

David Matthiesen, Trevor R. Jefferies, Houston, Jeffrey J. Zissa, San Antonio, for appellee.

Panel consists of Justices HEDGES, NUCHIA, and EVANS.[*]

## . OPINION

FRANK G. EVANS, Justice (Retired).

This is an insurance coverage dispute. Westchester Fire Insurance Company ("Westchester"), an excess insurer, appeals a summary judgment rendered in favor of its insured, Stewart & Stevenson Services, Inc. ("Stewart & Stevenson"). The issue on appeal is whether the primary insurer's policy (the Lloyds policy) had exhausted its aggregate limits, thus requiring the Westchester policy to "drop down" and

---

[*] The Honorable Frank G. Evans, retired Chief Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

cover damages incurred by Stewart & Stevenson as the result of a lawsuit brought by Jesus Herrera, a former employee (the *Herrera* lawsuit).

## I. FACTUAL BACKGROUND

### A. The Insurance Policies

Stewart & Stevenson has the following layers of insurance coverage.

#### 1. Self–Insured Retention

The contract between Stewart & Stevenson and its primary insurer provides a $200,000 self-insured retention (SIR) for any one accident or occurrence. The primary dispute between the parties at trial was whether the payment of defense costs by Stewart & Stevenson erodes the SIR.

#### 2. The Lloyds Policy

The Lloyds policy provides coverage for $1 million dollars per occurrence, with a $2 million dollar aggregate limit. The Lloyds policy has two distinct coverages: (a) Commercial General Liability (CGL) Coverage and (b) an Employment Practices Insurance (EPI) endorsement.

The SIR provision of the CGL coverage provides: "US 200,000 Self Insured Retention any one accident or occurrence," but is silent about whether the payment of defense costs by Stewart & Stevenson reduces the $200,000 SIR.

The EPI endorsement provides "claims made" coverage. The EPI SIR provision states that Lloyds is only responsible for the payment of "Loss[es] in excess of any SIR . . . ." "Loss" is defined in the EPI coverage of the Lloyds policy as "damage judgment (including prejudgment interest awarded against an Insured on that part of any judgement [sic] paid by us), settlements, statutory attorney fees and Defense Costs." Thus, under the EPI coverage of the Lloyds policy, payment of defense costs by Stewart & Stevenson will reduce its SIR.

#### 3. The Westchester Policy

The Westchester Policy is an excess policy that provides limits of $10 million per occurrence with a $10 million aggregate limit of liability. The Westchester policy, like the Lloyds policy, is divided into CGL coverage with a separate EPI endorsement (endorsement # 16).

##### a. The CGL coverage

The insuring agreement of the CGL coverage provides:

> We will indemnify the "insured" for those sums in excess of the "retained limit" which the "insured", by reason of liability imposed by law, or assumed by the "insured" under contract prior to the "occurrence", shall become legally obligated to pay as damages for [bodily injury or property damage, personal injury or advertising injury].

##### b. The EPI endorsement

The insuring agreement of the EPI endorsement provides: "We will pay those sums that the 'insured' must legally pay as damages because of an 'insured event' to which this insurance applies." The section of the EPI endorsement entitled "Coverage Limits" provides that it will pay for "loss[es]" resulting from "insured events." The definition of "Loss" includes "damage, judgment . . . and settlement." Of significance is that, under the Westchester EPI endorsement, "loss" does *not* include defense costs, but, under the Lloyds EPI endorsement, defense costs are specifically included in the definition of a "loss."

##### c. The Non–Drop Down Endorsement

Endorsement # 14 to the Westchester policy contains a "non-drop down" endorsement which states that Westchester will not "drop down" and provide coverage if the underlying coverage is exhausted by payment of losses that would not have been covered by the Westchester policy.

## B. Claims Made Under the Lloyds Policy

Stewart & Stevenson became a defendant in the lawsuit entitled *Jesus Herrera v. Stewart & Stevenson Services, Inc.* The suit was tried to a jury, which rendered a verdict in favor of Herrera in excess of $1.25 million. Stewart & Stevenson then settled with Herrera for $1,148,500 while the case was on appeal. Lloyds originally denied coverage for the *Herrera* suit because of late notice; however, they later paid what they calculated to be their limit of liability, and Stewart & Stevenson called upon Westchester to drop down and cover the excess. Westchester argued that the Lloyds policy had not been properly exhausted and refused to pay.

Before the *Herrera* suit, Lloyds had paid policy proceeds toward defense and/or settlement of three prior lawsuits on behalf of Stewart & Stevenson. These payments eroded the aggregate limits of liability of the Lloyds policy, although the parties dispute whether the aggregate has been exhausted.

The *Snell* lawsuit was filed as a claim under Lloyds CGL coverage and resulted in an $833,333 settlement.

The *Leal* lawsuit was also filed as a claim under Lloyds CGL coverage and resulted in a $255,000 settlement.

The *Campbell* lawsuit was filed as a claim under Lloyds EPI endorsement. It was tried to a defense verdict and generated $473,813.19 in defense costs.

## C. The Motions for Summary Judgment

Although the parties agreed that the *Snell, Leal,* and *Campbell* lawsuits eroded Lloyds' aggregate limit of liability, they disagreed about how to calculate the amount of the erosion. Both parties moved for summary judgment, each contending that its method of calculating the erosion of Lloyds' aggregate limit was correct.[1]

The trial court granted Stewart & Stevenson's motion for summary judgment as to Westchester. The court also denied Westchester's cross-motion for summary judgment. The court ordered that Stewart & Stevenson have judgment against Westchester in the amount of $273,359, *i.e.*, the exact amount Stewart & Stevenson had calculated that Westchester owed. The trial court denied Westchester's cross-motion for summary judgment.

## II. LAW AND ANALYSIS

### A. Standard of Review for Summary Judgments

Summary judgment is proper only when a movant establishes there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex.1995); *Phillips Natural Gas Co. v. Cardiff,* 823 S.W.2d 314, 317 (Tex.App.-Houston [1st Dist.] 1991, writ denied). In reviewing the summary judgment, we indulge every reasonable inference in favor of the nonmovant, assume all evidence favorable to the nonmovant is true, and resolve any doubts in its favor. *Johnson,* 891 S.W.2d at 644; *Cardiff,* 823 S.W.2d at 317.

When both parties file a motion for summary judgment, and one is granted and one is denied, the denial may be considered by the reviewing court if the appealing party complains of both the granting of the opponent's motion and the denial of its own motion. *Cardiff,* 823 S.W.2d at

---

1. The primary distinctions between the two methods of calculation are: (1) Stewart & Stevenson would apply defense costs to their SIR, while Westchester would require Lloyds to pay all defense costs and only payments by S & S toward actual settlements would erode the SIR (essentially, S & S would pay the SIR toward the settlement amount, resulting in smaller payments toward the total settlement by Lloyds. Lloyds would then pay all defense costs outside the policy limits); and (2) Westchester would not reduce the aggregate limits of the Lloyds coverage by the amounts Lloyds paid toward the *Campbell* defense.

317. We will determine all questions presented, and may reverse the trial court's judgment and render such judgment as the trial court should have rendered, including rendering judgment for the other movant. *Jones v. Strauss*, 745 S.W.2d 898, 900 (Tex.1988); *Cardiff*, 823 S.W.2d at 317. We will affirm the summary judgment if any of the theories advanced in Stewart & Stevenson's motion is meritorious. *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex.1989); *Dardari v. Texas Commerce Bank*, 961 S.W.2d 466, 468 (Tex.App.-Houston [1st Dist.] 1997, no writ).

### B. Westchester's Arguments on Appeal

Westchester presents two main arguments on appeal: First, it argues that the aggregate limits of the Lloyds policy were not exhausted, and that the trial court improperly concluded that: (a) Stewart & Stevenson's payment of defense costs eroded its SIR, and (b) Lloyds' aggregate was not reduced by the defense costs Lloyds paid toward the *Campbell* trial. Alternatively, Westchester argues that, even if Stewart & Stevenson and the trial court were correct in their method of calculating Lloyds' remaining aggregate, the Westchester policy was nonetheless not triggered because, under its own terms, it does not recognize the exhaustion of the primary policy by the payment of defense costs. Because Westchester's alternative theory does not rely on an interpretation of the Lloyds policy, but relies only on the terms of its own policy, we address that argument first.

### 1. Does the Westchester Policy Recognize the Exhaustion of the Lloyds Policy by the Payment Made by Lloyds Toward the *Campbell* Defense?

In response to Stewart & Stevenson's motion for summary judgment, and as grounds for its own summary judgment, Westchester argued that "[e]ven if the Court finds that the *Campbell* defense costs erode the Aggregate Limits of the Lloyds policy, the Westchester policy does not recognize exhaustion of its underlying limits by payments not covered under the Westchester policy." Specifically, Westchester argues that under its policy, defense costs are not a recognized loss which reduces its aggregate limits of liability. Therefore, by virtue of its "non-drop down" endorsement, Westchester argues that its liability was not triggered even if the Lloyds policy was exhausted because the exhaustion was the result of Lloyds' payment of defense costs in the *Campbell* lawsuit.

To determine the validity of Westchester's position, this Court must interpret the effect of the "non-drop down" endorsement, which provides as follows:

> In the event of the reduction or exhaustion of the Aggregate Limits of Liability of the "Underlying Insurance" by reason of payment of losses not covered by *this* policy; this policy shall apply in the same manner it would have applied had such aggregate limit not been reduced or exhausted. (Emphasis added.)

In the interpretation of the terms of an insurance contract, the general rules of contract construction apply. *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex.1995). The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. *National Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex.1995). If an instrument is worded so that it can be given an exact or certain legal interpretation, it is not ambiguous and a court can construe the contract as a matter of law. *Louisiana Natural Gas Pipeline, Inc. v. Bludworth Bond Shipyard, Inc.*, 875 S.W.2d 458, 461 (Tex.App.-Houston [1st Dist.] 1994, writ denied). As with any contract, absent a finding of ambiguity, a court must interpret the meaning and intent of an insurance policy from the four corners of the document without the aid of extrinsic evidence. *Carrabba v. Employers Cas. Co.*, 742 S.W.2d 709, 716 (Tex. App.-Houston [14th Dist.] 1987, no writ).

Only after a contract is found to be ambiguous may parol evidence be admitted for the purpose of ascertaining the true intentions of the parties expressed in the contract. *Friendswood Dev. Co. v. McDade + Co.*, 926 S.W.2d 280, 283 (Tex.1996). When construing a particular provision in an insurance policy, all of the policy's provisions should be given effect, and the whole contract considered, with each clause being used to help interpret the others. *Western Indem. Ins. Co. v. American Physicians Ins. Exch.*, 950 S.W.2d at 185, 188 (Tex.App.—Austin 1997, no writ).

Although we can find no cases interpreting such a clause, we do not believe that it is ambiguous. The literal meaning of the clause is that Westchester is not required to "drop down" and provide coverage if the Lloyds policy is exhausted by the payment of claims that the *Westchester* policy does not recognize as covered losses.

This interpretation is supported by a reading of other portions of the Westchester policy, which make it clear that the Westchester policy does not always "follow form" to the Lloyds policy. For example, section I.A.5. of Westchester's EPI coverage provides:

> Where any of the terms of this policy endorsement conflict with any terms of the "underlying endorsement", the terms of this endorsement shall apply.

These two clauses, read in conjunction, make it clear that the Westchester policy is not strictly a "follow form" policy; at times, the coverage provided by Westchester will differ from that provided by Lloyds. If the exhaustion of the Lloyds policy is achieved by paying a claim for which the Westchester and Lloyds policies provide different coverage, the Westchester policy is not required to "drop down."

2. Stewart & Stevenson argues there is no evidence the parties intended to create a "gap" in the coverage. However, absent ambiguity, evidence of the parties' intent is irrelevant. *Friendswood Dev. Co.*, 926 S.W.2d at 283.

As such, a gap in coverage might be created.[2]

### 2. Are Defense Costs a Covered "Loss" under the Westchester Policy?

■ Having concluded that, in some instances, the Lloyds policy and the Westchester policy provide different coverages, we must now decide whether this is one of those instances.[3] The issue is whether defense costs are a covered "loss" under the Westchester policy.

Because the *Campbell* case was a sexual harassment suit, we look to the EPI endorsement of the Westchester policy to determine whether defense costs associated with that suit would erode the Westchester aggregate limit. The insuring agreement provides:

> We will pay those *sums that the "insured" must legally pay as damages* because of an "insured event" to which this insurance applies. (Emphasis added.)

The "Coverage Limits" section provides:

> The Aggregate Limits is the most we will pay for the Combined total of all "claims" first made or brought during the "policy period" for "loss" that results from all "insured events."

"Loss" is defined in the Westchester policy as:

> [D]amage, judgment (including prejudgment interest awarded against an insured on that part of any judgement [sic] paid by us) and settlement. However, loss does not include civil or criminal fines or penalties imposed by law, non-monetary relief, liquidated damages where there is a finding of willfulness.

Most importantly, the definition of "loss" is preceded by a paragraph stating that it is "deleting in its entirety" a prior defini-

3. We will assume, without deciding, that the aggregate limits of the Lloyds policy were properly eroded when Lloyds paid $273,813.00 toward the *Campbell* defense costs.

tion of "loss" that expressly included defense costs.[4] Had the parties wished to include defense costs as a covered loss, it is unlikely that they would have rewritten the "loss" definition to delete any reference to defense costs.

As stated earlier, the Westchester policy provides that where its terms differ from the Lloyds policy, the Westchester policy terms will apply. Therefore, the Westchester's definition of "loss" governs, and it does not include defense costs as a covered loss. Rather, the Westchester policy contemplates that it will cover "damages" that its insured is "legally obligated to pay." This does not include defense costs.

Therefore, we conclude that defense costs are not included within the aggregate limits of the Westchester policy. Because the Westchester policy would not include defense costs within its aggregate limits, the non-drop down endorsement provides that Westchester will not recognize the erosion of the underlying Lloyds policy by including defense costs within its aggregate limits.

**3. Does the Westchester Policy Have to "Drop Down"?**

Lloyds paid $273,813 toward the defense costs of the *Campbell* lawsuit, which it then deducted from its remaining aggregate. However, as we have concluded, the Westchester policy does not define defense costs as a covered "loss," therefore, it is not required to recognize the erosion of the Lloyds aggregate by the payment of those defense costs. In the eyes of Westchester, it is as if the $273,813 in defense costs for the *Campbell* suit had never been

deducted from Lloyds aggregate limits. If the $273,813 were "added back" to the Lloyds aggregate, there would be no need for Westchester to "drop down" and cover the $273,359 deficit caused by the *Herrera* suit.

We sustain Westchester's second issue. Because our opinion is based on an interpretation of the Westchester policy, we need not address: (1) whether Westchester has standing to argue about the construction of the Lloyds policy, or (2) whether the SIR underlying the Lloyds policy was eroded by Stewart & Stevenson's payment of its own defense costs, or (3) any other issues related to the interpretation of the Lloyds policy.

## III. CONCLUSION

Because the trial court erroneously concluded that the Westchester policy had been triggered, it erred in granting Stewart & Stevenson's motion for summary judgment and in denying Westchester's motion for summary judgment. Accordingly, we reverse the judgment of the trial court and render a judgment ordering that Stewart & Stevenson take nothing from Westchester.

4. The applicable "loss" definition in the Westchester policy is preceded by a paragraph that states:

> Insuring Agreement VI—Definitions, Paragraph C—"Loss" is deleted its entirety and replaced with the [applicable "loss" definition]:

Several pages later in the contract, Insuring Agreement VI—Definitions, Paragraph C provided the prior definition of "Loss" as:

> [D]amage, judgment, (including prejudgment interest awarded against an insured

on that part of any judgment paid by us), settlements, statutory attorney fees and *defense costs*. However, loss shall not include civil or criminal fines or penalties imposed by law, non-monetary relief, liquidated damages where there is a finding of willfulness.

Thus, by looking solely at the four corners of the Westchester policy, it is readily apparent that the parties expressly removed defense costs from the definition of a covered "loss."