WELLINGTON UNDERWRITING AGENCIES LIMITED; Syndicate 2020; Anton Private Capital Limited; CBS Private Capital Limited; Argenta Private Capital Limited; Syndicate 3030; Amlin Underwriting Ltd.; Syndicate 2001; Navigators Underwriting Agency Ltd.; Syndicate 1221; Marlborough Underwriting Agency Ltd.; Syndicate 1861; Managing Agency Partners Ltd.; Syndicate 2791; Hardy (Underwriting Agencies) Ltd.; Syndicate 382; Beazley Furlonge Ltd.; Syndicate 623; Houston Casualty Company; Navigators Insurance Company; AXA Corporate Solutions Reassurance–Paris; AXA Corporate Solutions IUA; AXA Corporate Solutions Insurance Company; AXA Corporate Solutions Reinsurance; AXA Corporate Solutions Lloyd's Insurance Company of Texas; Commonwealth Insurance Company; International Insurance Company of Hannover Limited; and American Offshore International Syndicate, Appellants,

v.

The HOUSTON EXPLORATION COMPANY and Offshore Specialty Fabricators, Inc., Appellees.

No. 14–07–00970–CV.

Court of Appeals of Texas, Houston (14th Dist.).

July 17, 2008.

Rehearing Overruled Sept. 4, 2008.

Glenn R. Legge, Alexander Christos Papandreou, Karen A. Conticello, Houston, TX, for Appellants.

James Winton, Farrell Ann Hochmuth, Harry Lloyd Scarborough, Francis I. Spagnoletti, Marc Evan Kutner, S. Shawn Stephens, Robert Lee Galloway, Houston, Ashley T. Parrish, Dallas, TX, for Appellees.

Panel consists of Chief Justice HEDGES and Justices FOWLER and BOYCE.

## OPINION

ADELE HEDGES, Chief Justice.

Appellants, a group of insurance underwriters lead by Wellington Underwriting Agencies Limited (collectively "Underwriters"), bring this interlocutory appeal from a partial summary judgment order favoring appellees, The Houston Exploration Company ("Houston Exploration") and Offshore Specialty Fabricators, Inc. ("OSFI").[1] Underwriters issued an insurance policy covering an offshore platform project undertaken by appellees. Appellees sued Underwriters for Underwriters' failure to pay weather stand-by charges in connection with covered repairs on the off-

---

1. The trial court signed an order for interlocutory appeal pursuant to Texas Civil Practice and Remedies Code section 51.014(d). Tex. Civ. Prac. & Rem.Code § 51.014(d).

shore platform which were delayed by tropical storms. Underwriters counterclaimed, alleging that appellees committed fraud, breach of contract, and violations of the Texas Insurance Code in submitting their insurance claims. In two issues, Underwriters contend that the trial court erred in granting summary judgment favoring appellees on (1) the issue of whether the policy covered weather stand-by charges, and (2) Underwriters' fraud and breach of contract counterclaims. We reverse the trial court's summary judgment order and remand for further proceedings in accordance with this opinion.

## I. Background

In 2002, Houston Exploration hired OSFI to build an offshore production platform in the Gulf of Mexico. In August of that year, construction hit unstable ground on the seabed, damaging one of the legs and leaving the jacket—the steel legs of the platform anchored directly to the seabed and supporting the deck—at an unuseable angle. As repair efforts progressed, several named tropical storms passed through the Gulf delaying work. Rather than release the repair vessels, OSFI placed them on "stand by" so that they would be available as soon as the storms passed. It is these weather stand-by charges that are primarily at issue in this case.

Under the contract between Houston Exploration and OSFI, OSFI was required to purchase builder's risk insurance for the platform project. Through a series of brokers in Houston and London, OSFI purchased an All Risk Installation Floater policy from Underwriters. The policy was based on a Wellington Underwriting Agencies form called the WELCAR 2001. The policy's preamble states as follows:

Subject to the terms, conditions and exclusions herein, this Policy provides coverage for certain physical damage and liabilities incurred by the Assureds. Section I—Physical Damage and Section II—Liability are distinct sections, with the exception that the Scope of Insurance and General Terms and Conditions below shall apply to Section I and Section II.

In entering the contract, the parties lined through the entirety of Section II, leaving only coverage for "Physical Damage" under Section I. As will be described below, the parties also lined through certain paragraphs of Section I.

Under the "Scope of Insurance" section of the policy (which precedes Section I and expressly applies to it), the policy provides that the covered activities include construction and installation, among numerous other activities. Paragraph 1 of the Scope of Insurance section identifies OSFI as the Principal Assured. Other Assureds are defined as "[a]ny other company, firm, person or party . . . with whom the Assured(s) . . . have entered into written contract(s) directly in connection with the Project."

Paragraph 1 of "Section I—Physical Damage" states under the heading "Covered Perils" that "[s]ubject to the terms, conditions and exclusions herein, Section I insures against all risks of physical loss of and/or physical damage to the property covered hereunder, provided such loss or damage arises from an Occurrence within the Policy Period. . . ." Under the "Terms and Conditions" portion of Section I, the first paragraph states as follows:

1. BASIS OF RECOVERY

In the event of an Occurrence covered under Section I of the Policy, Underwriters agree to indemnify the Assured on the following basis:

a. *items repaired or replaced*—"New for Old" plus towage, installation and all other costs necessarily incurred and duly justified in repair or

replacement—as per latest agreed Schedule B.

. . . .

d. *use of prehired vessels/equipment—* It is understood and agreed that if, in the event of physical loss and/or physical damage to the property insured which is covered by Section I, repairs and/or reinstatement and/or replacement and/or salvage are carried out by vessels and/or craft and/or equipment and/or labour which the Assured have on charter, hire or contracted to them, the cost or the proportion thereof shall be based on the pre-agreed hire or contract rates for such employment when used in or about the repair, reinstatement, replacement, or salvage of losses covered by Section I and shall be so recoverable as a claim hereon. In the event that the Assured utilises [sic] its own vessels, craft, equipment, material or labour for any repair, reinstatement, replacement or other work in respect of physical loss and/or physical damage covered by Section I, then, subject otherwise to the terms and conditions of the Policy, a reasonable charge in respect of such work shall be recoverable as a claim hereon. Provided always that the recoverable costs referred to in this paragraph shall not exceed the costs of employing approved vessels and/or craft and/or equipment and/or materials and/or labour from other available sources.

Paragraph 2 incorporates the following clause from the "Institute Clauses for Builders Risks":

5. PERILS

5.1 SUBJECT ALWAYS TO ITS TERMS, CONDITIONS AND EXCLUSIONS this insurance covers all risks of physical loss of or physical damage to the subject matter insured caused and discovered during the period of the insurance.

Among the provisions lined-through or stricken-out in Section I is Paragraph 13, which reads as follows:

13. STAND–BY CHARGES

Subject to a sub limit of US$ (AMOUNT) and one Occurrence aggregated at US$ (AMOUNT) over the Policy Period, Underwriters shall indemnify the Assureds for the cost of stand by time on vessels and/or craft and/or equipment actively engaged in the course of repair following an Occurrence covered under Section I, where the Assureds are prevented from working in, around or about the damaged property by bad weather, including named hurricanes.

Lastly, among the deductibles listed in the policy declarations is the following applicable to stand-by charges: "vi. 48 hours each and every Occurrence in respect of stand-by charges."

The parties do not dispute that the damage to the platform jacket occurring in August 2002 was a covered occurrence under the policy. Appellees filed a claim with Underwriters; Underwriters paid the majority of the claim ($2,034,961.12) but refused to pay the weather stand-by charges allegedly incurred when repair vessels were unable to work due to tropical storms in the Gulf. As mentioned above, appellees sued Underwriters for failure to reimburse the weather stand-by charges. Underwriters counterclaimed, alleging fraud, breach of contract, and violations of the Texas Insurance Code in the submission of the claims. The trial court granted partial summary judgment, holding Underwriters responsible for the stand-by charges under the policy and consequently

granting judgment against Underwriters' fraud and breach of contract counterclaims. In its order, the trial court explained its ruling thus:

> Plaintiffs [appellees] sought judgment on their claim for coverage under the All Risk Installation Floater policy of insurance (the "Policy") and on the issue of whether the Proof of Loss executed by OSFI barred Houston Exploration's claim under the Policy. Underwriters sought judgment on their defenses that coverage did not exist and/or that any liability had been released. The Court, having disregarded the stricken policy language as parol evidence, found the Policy to be unambiguous in favor of coverage. The Policy is only ambiguous if the stricken language is read into the Policy, and then treated as an exclusion. The stricken language is parol evidence that *creates* an ambiguity, necessitating further parole evidence. Whereas parol evidence may be used to interpret an ambiguous contract, it cannot be used to create an ambiguity. By ignoring the stricken language and treating it as never having been in the policy (as is the case when only looking at the four corners of the Policy), the contract is unambiguous. (Emphasis in original).

It is from this order that the present interlocutory appeal is brought. We begin by addressing the coverage issue and then will briefly address the counterclaims.

## II. Coverage

### A. Standards of Review

In their first issue, Underwriters contend that the trial court erred in granting summary judgment favoring appellees on the coverage question and in refusing to grant summary judgment favoring Underwriters. More specifically, Underwriters contend that the trial court incorrectly interpreted the insurance policy as covering weather stand-by charges. We analyze the grant of a traditional motion for summary judgment under well-established standards of review. *See generally* Tex.R. Civ. P. 166a; *Nixon v. Mr. Prop. Mgmt. Co., Inc.*, 690 S.W.2d 546, 548–49 (Tex. 1985). The movant bears the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c). We review the motion and the evidence de novo, taking as true all evidence favorable to the nonmovant, and indulging every reasonable inference and resolving any doubts in the nonmovant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex.2005). Where, as here, both sides filed motions seeking summary judgment on the same issue, and the trial court granted one while denying the other, we review both sides' summary judgment evidence, determine all questions presented, and, if the trial court erred, render the judgment the trial court should have rendered. *Id.*

The sole question before us in Underwriters' first issue concerns the correct interpretation of the insurance policy. In Texas, insurance policies are construed according to the ordinary rules of contract construction. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex.2003). In applying these rules, our primary concern is to ascertain the parties' intent as expressed in the language of the policy. *Kelley–Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex.1998). To determine that intention, we generally limit our inquiry to the "four corners" of the policy. *See Esquivel v. Murray Guard, Inc.*, 992 S.W.2d 536, 544 (Tex.App.–Houston [14th Dist.] 1999, pet. denied). When possible, we must harmonize all of the provisions with reference to the entire agreement; no single provision should be read as controlling. *Coker v. Coker*, 650

S.W.2d 391, 393 (Tex.1983). If a written policy is worded so that it can be given a definite or certain legal meaning, then it is unambiguous, and we may not accept parol or extrinsic evidence as to the parties' intent. *Kelley–Coppedge*, 980 S.W.2d at 464. Whether policy language is ambiguous is a question of law. *Schaefer*, 124 S.W.3d at 157. Ambiguity does not arise simply because the parties offer conflicting interpretations; rather, ambiguity exists only when the contract is susceptible of two or more reasonable interpretations. *Id.* Moreover, ambiguity must be evident from the policy itself; it cannot be created by introducing parol evidence of intent. *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 747 (Tex.2006). Usually, if language in an insurance policy is deemed susceptible to more than one reasonable interpretation, the reasonable construction most favorable to the insured is imposed. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex.1991). We thus construe an ambiguous insurance policy strictly against the insurer and liberally in favor of the insured. *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex.1987).

### B. Appellees' Contentions

In their motion for summary judgment and on appeal, appellees point to four portions of the policy as demonstrating that weather stand-by charges were covered: (1) Covered Perils paragraph 1, wherein it states that the policy "insures against all risks"; (2) Terms and Conditions subparagraph 1a, stating that the basis of recovery includes all costs "necessarily incurred and duly justified in repair or replacement"; (3) subparagraph 1d of the same section, wherein it provides for payment for vessels and equipment "when used in or about the repair"; and (4) the list of deductibles, which lists a deductible of "48 hours each and every Occurrence in respect of stand-by charges."[2] We will consider each of these sections in turn and then will examine stricken paragraph 13, which expressly discusses weather stand-by charges.

### 1. "all risks"

■ Appellees first argue that the fact that the policy expressly "insures against *all risks* of physical loss of and/or physical damage to the property" means that weather stand-by charges are covered. In support of their argument, appellees rely primarily on the United States Supreme Court's opinion in *Lanasa Fruit Steamship & Importing Co. v. Universal Insurance Co.*, 302 U.S. 556, 58 S.Ct. 371, 82 L.Ed. 422 (1938), and our opinion in *de Laurentis v. United Services Automobile Association*, 162 S.W.3d 714 (Tex.App.–Houston [14th Dist.] 2005, pet. denied). According to appellees, these cases stand for the proposition that the stand-by charges are covered under this all risk policy because they "naturally flowed" from the damage to the platform jacket. We disagree.

In *Lanasa*, the Supreme Court stated that "[a]ll the consequences naturally flowing from the peril insured against, or incident thereto, are properly attributable to the peril itself." 302 U.S. at 565, 58 S.Ct. 371 (quoting *Magoun v. New England Marine Ins. Co.*, 1 Story 157, 16 F.Cas. 483 (C.C.D.Mass.1840)). However, the court was speaking of physical losses as consequences of an occurrence; it was not defining which costs associated with repairs would be recoverable. Indeed, the "consequences" at issue in *Lanasa*, and in

**2.** In the trial court, Houston Exploration filed a motion for summary judgment that OSFI joined. Both of these parties have filed briefs on appeal. We will consider all of the arguments of both parties as relevant to the appeal.

all the examples from other cases cited therein, were physical damage, physical loss, physical consequences, not costs associated with repairs. The claim in *Lanasa* itself involved a stranded steamship and a cargo of bananas that rotted before the vessel could be freed. *Id.* at 557, 58 S.Ct. 371. While the insurance policy at issue covered "perils of the sea," the insurer argued that the bananas were ruined by "inherent vice," *i.e.*, natural processes of decay, and not directly by a peril of the sea, *i.e.*, the stranding. *Id.* at 560–61, 58 S.Ct. 371. The Court rejected this argument, holding that the stranding was the "real efficient cause" of the loss of the fruit. Because the stranding was a covered occurrence, the physical loss of the fruit that naturally flowed from the occurrence was covered under the policy.[3]

In *de Laurentis*, we considered whether mold damage to a house was covered under a homeowner's policy. 162 S.W.3d at 721. The insurance company argued that mold was not a covered peril under the "named-perils policy." We agreed with the homeowner that the mold damage was caused by a water leak, which was a covered peril under the policy. *Id.* at 724–25. We explained that "a *physical loss* includes the natural consequences of the named peril" and consequently the mold "damage could be a *physical loss* covered under the ... policy." *Id.* at 723, 725 (emphasis added).[4]

In sum, all of the cases cited by appellees in their all-risk argument involved questions of coverage of physical loss or physical damage, not whether certain costs of repair should be paid by the insurer. The weather stand-by charges themselves did not constitute "physical loss" of or "physical damage" to covered property; rather, as a cost associated with repairing the original damage, they are a cost caused only by a delay in the repairs.

Instead of looking to case law to determine what costs an insurance policy covers, we should look first to the policy itself. The policy in the present case expressly subjects coverage of all risks to "the terms, conditions and exclusions" contained within the policy. The policy also contains a "Basis of Recovery" section, which explains what costs of repair will generally be paid (subject to other provisions offering additional coverage and various exclusions). If the "all risk" language in the Covered Perils section meant that Underwriters would pay all costs associated with repairs, then the policy's Basis of Recovery section would be rendered surplusage. *See Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex.2006) (stating that a contract should be read so that no provision is rendered meaningless). Accordingly, we find appellees' argument that the fact that the policy uses "all risks" language means it necessarily covers weather stand-by charges to be without merit.

---

**3.** The *Magoun* case, heavily relied upon by the *Lanasa* court, involved a ship that had been detained by government authorities (a covered peril) and then had rotted while left exposed in a hot climate (a noncovered peril). 1 Story 157. The court concluded that the resulting physical damage to the vessel was covered because it naturally flowed from the detention. *Id.* Similarly, in *Reischer v. Borwick*, 2 Q.B. 548, 1894 WL 9880 (1894), an English common law case cited by the *Lanasa* court, the court concluded that the physical damage to a vessel from water rushing in

through a temporarily plugged hole naturally flowed from the collision that caused the hole.

**4.** Appellees also cite *Stanley v. Onetta Boat Works, Inc.*, 303 F.Supp. 99 (D.Ore.1969), in which the court considered whether damages for loss of use of a vessel while being repaired were covered under an insurance policy. Again, this case involved a physical loss and not a calculation of costs associated with repairs.

### 2. "necessarily incurred and duly justified"

■ Appellees next point to subparagraph 1a and the statement contained therein that the Basis of Recovery under the policy includes all costs "necessarily incurred and duly justified in repair or replacement." In its brief, Houston Exploration wholly fails to make an argument as to why the weather stand-by charges would have been covered as included within the "necessarily incurred" language. Houston Exploration instead cites to a report wherein the Underwriters' adjuster stated that the stand-by charges were "commensurate with normal vessel day rates being charged in the Gulf of Mexico at the time of loss, and approved this amount as directly claim related." While the report supports the conclusion that the charges may have been "duly justified," it says nothing about their necessity.

In its brief, OSFI states that weather stand-by charges are routine and necessary in the Gulf during hurricane season and that payment of the charges "was critical to ensure that vessels were available" to effect repairs after the storms passed. In support of these claims, OSFI cites to affidavits from an expert retained by Houston Exploration and from an employee of Houston Exploration's project manager for the platform installation project. Both men averred that had the repair vessels been released instead of being paid for stand-by time, and had OSFI and Houston Exploration attempted to "immediately" seek repair vessels after the storms passed, the rate for such vessels would have been substantially higher than the stand-by charges.[5]

It is unclear exactly what this parol evidence proves. At best, it appears to establish that if appellees wanted to get repairs underway *immediately* after the storms passed, paying stand-by charges would have been a good idea. It does not, however, prove as a matter of law that stand-by charges were "necessarily incurred," and it certainly does not support the trial court's holding that the parties expressed a clear intent within the four corners of the policy to cover weather stand-by charges. *See, e.g., Esquivel,* 992 S.W.2d at 544 (stating that in determining the intention of parties to an insurance policy, a court should generally limit its inquiry to the four corners of the policy).[6]

### 3. "used in or about the repair"

■ Appellees next cite subparagraph 1d, which provides a basis of recovery for the use in repairs of "prehired" vessels and equipment. As relevant to our purposes here, the provision states that if repairs are carried out by vessels that the assured already has hired out, the payable cost for use of the vessels shall be based on the pre-agreed rates for the time that the vessels are being "used in or about the repair." Appellees argue that the "when used in or about the repair" language covers vessels that are on stand by waiting for

---

**5.** The project manager's employee stated the rate would have been at least twice that of the vessels placed on stand by. The expert opined that the rate would have been 25–100% higher. Neither man cited any evidence as to what repair vessel rates actually were after the storms passed.

**6.** The cited evidence also does not directly support OSFI's contentions that (1) weather stand-by charges are routine and necessary in the Gulf during hurricane season, and (2) such payments were critical to ensure that vessels were available. In their reply brief, Underwriters cite to additional evidence as demonstrating that most of the charges at issue were paid for OSFI's own vehicles. It is left unsaid in the record whether stand-by payments were necessary to keep these vessels from being hired out to do repairs for another company after the storm.

storms to pass. They particularly emphasize the "or about" language, apparently recognizing that vessels on stand by are by definition not being "used in" repair efforts. Appellees offer no definition of "about." *The American Heritage Dictionary* defines "about" when used as a preposition as meaning: "1. On all sides of; surrounding. 2. In the vicinity of; around.... 6. Ready or prepared to do something.... 7. Involved with or engaged in." *Am. Heritage Dictionary* (2d College Ed.1991). *Webster's* defines it as "1: in a circle around ... 2 a: in the immediate neighborhood of: NEAR, fish are abundant the ˜reefs ... e: at the command of: in readiness for the use of ... 3 a: in the act or process of doing: engaged in ... b: on the point or verge of...." *Webster's Third New International Dictionary* (1993). The gist of these definitions suggests that a vessel that is being "used ... about [a] repair" is going to be in close proximity and either engaged in or immediately ready and available to work. Thus, a vessel that has left the area or is unable to work due to tropical storms in the Gulf is not then being "used ... about [a] repair." Consequently, appellees' reliance on section 1d as covering weather stand-by charges is without merit.

### 4. "48 hours each and every Occurrence"

 Lastly, appellees point to a sentence fragment among a list of deductibles at the end of the policy. The item states in full: "48 hours each and every Occurrence in respect of stand-by

charges." Appellees argue that this stand-by deductible proves as a matter of law that the policy covers weather stand-by charges. We again acknowledge that generally, a contract should be read as a whole and an interpretation giving effect to every part of the agreement favored so that no provision is rendered meaningless. *See Seagull Energy,* 207 S.W.3d at 345. However, because here the only reference to stand-by charges in the agreement other than the deductible was the stricken paragraph 13 (and as will be discussed below, the striking of Paragraph 13 indicates the parties did not intend for weather stand-by charges to be covered), we find the stand-by deductible to be mere surplusage and of no effect. *See Republic Ins. Co. v. Silverton Elevators, Inc.,* 493 S.W.2d 748, 753 (Tex.1973) (finding that inapplicable and meaningless surplusage in an insurance policy should be disregarded).[7] In sum, none of the policy sections cited by appellees unambiguously demonstrates an intent to cover weather stand-by charges.

### C. Paragraph 13

Having determined that the unstricken portions of the policy do not unambiguously provide coverage for weather stand-by charges, we now turn to consideration of Section I, Paragraph 13, entitled "Stand-by charges." It reads as follows:

> Subject to a sub limit of US$ (AMOUNT) and one Occurrence aggregated at US$ (AMOUNT) over the Policy Period, Underwriters shall indemnify the Assureds for the cost of

---

7. The parties apparently simply failed to strike the language out. Obviously, since there is no coverage for weather stand-by charges, it would not have seemed particularly important to the parties to eliminate this otherwise meaningless deductible.

We further note that the parties also failed to strike references to Section II of the policy, which was itself stricken in its entirety. The unstricken deductible appears to do no more to resurrect coverage of weather stand-by charges than the unstricken references to Section II do to resurrect Section II.

stand by time on vessels and/or craft and/or equipment actively engaged in the course of repair following an Occurrence covered under Section I, where the Assureds are prevented from working in, around or about the damaged property by bad weather, including named hurricanes.

As discussed above, this portion of the policy form was lined-out but remained in the instrument that was initialed by the parties.

Appellees first argue that this section should not be considered in interpreting the policy because it is parol evidence and not part of the four corners of the agreement. Underwriters cite several cases, most notably *Gibson v. Turner*, 156 Tex. 289, 294 S.W.2d 781 (Tex.1956), and *Westchester Fire Insurance Co. v. Stewart & Stevenson Services, Inc.*, 31 S.W.3d 654 (Tex.App.–Houston [1st Dist.] 2000, pet. denied), in which Texas courts have considered—to one degree or another—stricken language in interpreting a contract. In *Gibson*, the Texas Supreme Court interpreted an unambiguous oil and gas lease in light of the fact that a certain clause had been struck. 156 Tex. at 296–97, 294 S.W.2d at 785. Appellees attempt to minimize the impact of *Gibson* by suggesting that the court's review of the stricken language in that case was essentially dicta because other portions of the lease at issue supported the court's interpretation. But the court itself identified the stricken language as one of four parts of the lease supporting its holding. *Id.* Furthermore,

the court described the stricken portion as a provision of the lease and indicated that it was within the four-corners of the instrument. *Id.* at 782–83, 785. Accordingly, we read *Gibson* as directly supporting the notion that stricken language in an agreement can be utilized in interpreting the agreement.

■ In *Westchester*, the First Court of Appeals interpreted an unambiguous insurance policy in light of the fact that a particular paragraph, although remaining in the final version of the policy, was noted as being "delet[ed] in its entirety." 31 S.W.3d at 659–60 & n. 4.[8] The court expressly stated that in considering the fact of the deletion, it was "looking solely at the four corners of the ... policy." *Id.* at 660 n. 4. We find that both *Gibson* and *Westchester* support the notion that deletions remaining within an insurance policy can be considered in construing an unambiguous insurance policy.

■ Appellees next argue that even if Paragraph 13 is considered, it only served to create a "sub limit" for weather standby charges and did not create coverage for such charges.[9] We disagree. The language Appellees rely on in arguing that paragraph 13 imposes only a sub-limit and does not create coverage reads: "Subject to a sub limit of US$ (AMOUNT) and one Occurrence aggregated at US$ (AMOUNT) over the Policy Period...." Appellees' proposed construction does not make legal or grammatical sense. Legally, it does not make sense because it

---

8. Specifically, the "deleted" section of the policy defined "loss" to include defense costs. A separate section also defined "loss" but did not mention defense costs. The paragraph immediately preceding the latter definition stated that the former definition was "delet[ed] in its entirety." The court expressly examined the "deleted" definition in concluding that the remaining definition did not in-

clude defense costs. *Westchester,* 31 S.W.3d at 659–60.

9. In other words, appellees contend that the reference to stand-by charges in Paragraph 13 only recognized the existence of stand-by coverage elsewhere in the policy. They argue that Paragraph 13 merely capped that coverage.

only takes into account the first one and one-half lines of the paragraph, which mentions the sub-limit, and ignores as superfluous the remaining four and one-half lines, which begin by stating that "Underwriters shall indemnify the Assureds for the cost of stand by time...." The law strongly disfavors such a result. *See Seagull Energy*, 207 S.W.3d at 345 (stating that a contract should be read so that no provision is rendered meaningless). Grammatically, the appellees' construction does not make sense because the phrase "Subject to a sub limit of US$ (AMOUNT) and one Occurrence aggregated at US$ (AMOUNT) over the Policy Period ..." is a dependent, adverb clause that modifies the remainder of the sentence, the independent clause. Specifically, as an adverb phrase, its purpose is to modify the verb "shall indemnify" by stating to what degree Underwriters shall indemnify the assureds. Making a modifying phrase the focal point of a sentence—while ignoring the verb it modifies and the independent clause in which the verb resides—turns grammar on its head.

■ Having determined that the stricken language in paragraph 13 can be considered in construing the policy and that such language would have served to create weather stand-by coverage had it not been stricken, we must now examine the impact of the stricken language on our interpretation of the policy. Simply put, it is decisive.

To begin with, the creation of weather stand-by coverage in stricken paragraph 13 strongly suggests that such coverage was not intended to be included elsewhere in the policy; otherwise, as stated above, paragraph 13 would be mostly redundant, superfluous, and surplusage. *See id.* Perhaps more importantly, the language of Paragraph 13 appears designed to complement the language of subparagraph 1d discussed above. Paragraph 13 states that "Underwriters shall indemnify ... for the cost of stand by time on vessels ... where the Assureds are prevented from working in, around or about the damaged property by bad weather." It defines "stand by time" as when vessels "are prevented from working in, around or about" repairs. Subparagraph 1d provides a basis of recovery for when vessels are "used in or about the repair." In other words, subparagraph 1d governs when vessels are being used in repair efforts, and paragraph 13 governs when vessels are not being used because of foul weather. This further establishes that absent Paragraph 13, the policy was not intended to cover weather stand-by charges.[10] Moreover, the fact that the policy contains a separate paragraph providing for weather stand-by charges also indicates that such charges would not be considered as "necessarily incurred" under subparagraph 1a.

Based on the foregoing analysis, we find that the policy unambiguously expresses an intent that weather stand-by charges not be covered.[11] The trial court erred in

10. Appellees additionally urge that in an all-risk insurance policy, stricken language cannot take the place of a specific exclusion. However, we do not read the stricken section as an exclusion but instead use it in interpreting the contract as a whole. *See Coker,* 650 S.W.2d at 393 (advising that courts should try to harmonize all provisions of a contract with reference to the entire agreement and that no single provision should be read as controlling). In other words, the stricken language of paragraph 13 confirms that without paragraph 13, the policy does not cover weather stand-by charges.

11. Both sides cite to parol evidence as supporting their preferred interpretation of the policy. Because we find the policy is unambiguous, we need not review the parol evidence. *See Kelley–Coppedge,* 980 S.W.2d at 464.

granting summary judgment favoring appellees and in refusing to grant summary judgment favoring Underwriters on this coverage question. Accordingly, we sustain Underwriters' first issue.

### III. Counterclaims

In their second issue, Underwriters contend that the trial court erred in granting summary judgment favoring appellees on Underwriters' counterclaims for fraud and breach of contract. As Houston Exploration's counsel acknowledged during oral argument, our holding on Underwriters' first issue is dispositive of this second issue. In other words, having sustained Underwriters' first issue, the basis for the trial court's grant of summary judgment against the counterclaims is removed. The trial court itself recognized this linkage in its certification of the interlocutory appeal, wherein it stated the two issues for review were (1) whether the policy provided coverage for weather stand-by charges, and (2) *if such coverage exists,* whether Underwriters' counterclaims are without merit. Accordingly, we sustain Underwriters' second issue.

We reverse the trial court's order and remand for further proceedings in accordance with this opinion.